745 N.E.2d 1233 (2001)
195 Ill.2d 291
253 Ill.Dec. 699
In re R.C., a Minor (R.W. et al., Appellants,
v.
D.C., Appellee).
Nos. 88891, 89018.
Supreme Court of Illinois.
March 2, 2001.
*1236 Karen B. Ksander, Chicago, for appellants R.W. and C.W.
Edward O'Connell, Chicago, for appellant guardian ad litem.
Joel D. Bertocchi, Solicitor General, and Jan E. Hughes, Assistant Attorney General, Chicago, for intervenor-appellant James E. Ryan, Attorney General.
Rita A. Fry, Public Defender, Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellee.
Renee Goldfarb, Teresa Maganzini and Nancy G. Kisicki, Assistant State's Attorneys, Chicago, for amicus curiae Richard A. Devine, Cook County State's Attorney.
Justice FREEMAN delivered the opinion of the court:
In this direct appeal, we are asked to review the circuit court's determination that section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 1998)) is unconstitutional. We find the statute constitutional, and accordingly reverse and remand for further proceedings.

BACKGROUND
The parties do not dispute some basic background facts. D.C. became pregnant in 1994. In January 1995, as her due date approached, D.C. contacted Lutheran Child and Family Services (Lutheran) regarding adoption placement for her soonto-be-born child. Lutheran began to consider placement options for the child and eventually narrowed the choice to two couples, one of which was R.W. and C.W., the petitioners in this case. On February 4, 1995, D.C. gave birth to R.C. at Ottawa Community Hospital. At that time, D.C. signed an agreement giving Lutheran temporary custody of R.C. for placement purposes. She also indicated that, of the two families being considered by Lutheran, she would prefer that R.C. be placed with petitioners. Two days after the birth, D.C. was transferred to the hospital's psychiatric ward. On February 7, 1995, three days after R.C.'s birth, Lutheran placed the child with petitioners. So far as the record reveals, R.C. has lived with them ever since. D.C. was discharged from the hospital within two weeks, but entered and departed psychiatric institutions on multiple occasions during the next several months, and never signed a surrender of parental rights. The alleged birth father surrendered his parental rights soon after the child's birth and is not a party to this action.
*1237 On April 7, 1995, R.W. and C.W. filed the instant petition for adoption. Petitioners contend that D.C.'s consent to the adoption is not required because she is an unfit parent as defined in section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 1998)). That section provides that one ground upon which an individual may be found unfit is
"(p) Inability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness or mental retardation as defined in Section 1-116 of the Mental Health and Developmental Disabilities Code, or developmental disability as defined in Section 1-106 of that Code, and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period. However, this subdivision (p) shall not be construed so as to permit a licensed clinical social worker to conduct any medical diagnosis to determine mental illness or mental impairment." 750 ILCS 50/1(D)(p) (West 1998).
On the same day that R.W. and C.W. filed their petition, the trial court entered an interim order terminating the father's parental rights and awarding temporary custody to the foster parents until further order. The case encountered numerous procedural delays, including changes of counsel, stays, and an interlocutory appeal. In August 1998, counsel for D.C. filed a motion to dismiss the complaint on the grounds that section 1(D)(p) was unconstitutional and was preempted by the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 et seq. (1994)). In January 2000 the circuit court entered an order rejecting D.C.'s contention regarding the ADA but finding section 1(D)(p) unconstitutional on its face. The court found that the provision was "facially vague and violates due process[,] facially violates substantive due process[,] facially violates procedural due process[,] and facially violates equal protection."
Petitioners and R.C., through her guardian ad litem, filed a notice of appeal. The circuit court allowed the Illinois Attorney General to intervene in the case, and the Attorney General filed a separate notice of appeal. We have consolidated the appeals, which lie directly to this court because the circuit court declared an Illinois statute invalid. 134 Ill.2d R. 302(a)(1). Additionally, we permitted the Cook County State's Attorney to file a brief as amicus curiae in support of petitioners.

ANALYSIS
All statutes are presumed to be constitutional. Arangold Corp. v. Zehnder, 187 Ill.2d 341, 351, 240 Ill.Dec. 710, 718 N.E.2d 191 (1999). The party challenging the constitutionality of a statute bears the burden of rebutting this presumption and clearly establishing a constitutional violation. Arangold, 187 Ill.2d at 351, 240 Ill. Dec. 710, 718 N.E.2d 191. As the issue is one of law, we review de novo any decision finding a statute unconstitutional. People v. Jung, 192 Ill.2d 1, 248 Ill.Dec. 258, 733 N.E.2d 1256 (2000); People ex rel. Lumpkin v. Cassidy, 184 Ill.2d 117, 234 Ill.Dec. 389, 703 N.E.2d 1 (1998). It is our duty to construe acts of the legislature so as to affirm their constitutionality and validity if we can reasonably do so. R.W. Dunteman Co. v. C/G Enterprises, Inc., 181 Ill.2d 153, 163, 229 Ill.Dec. 533, 692 N.E.2d 306 (1998).
In this case the circuit court declared that section 1(D)(p) was unconstitutional on its face. It is well settled that a facial challenge
"must overcome considerable hurdles:

*1238 `A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the [statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an "overbreadth" doctrine outside the limited context of the First Amendment.'" In re C.E., 161 Ill.2d 200, 210-11, 204 Ill.Dec. 121, 641 N.E.2d 345 (1994), quoting United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697, 707 (1987).
Initially, we note that our appellate court has consistently upheld section 1(D)(p) against these constitutional challenges. See In re B.S., 317 Ill.App.3d 650, 663-64, 251 Ill.Dec. 323, 740 N.E.2d 404 (2000) (statute not vague or in violation of equal protection or due process); In re J.S., 213 Ill.App.3d 126, 156 Ill.Dec. 723, 571 N.E.2d 507 (1991) (statute not vague); In re I.D., 205 Ill.App.3d 543, 548-50, 151 Ill.Dec. 94, 563 N.E.2d 1200 (1990) (upholding statute against general due process and equal protection challenges). No panel of the appellate court has ruled to the contrary. The circuit court noted J.S. and I.D. in its memorandum order but refused to follow this authority. As we have repeatedly held, this is error. "It is the absolute duty of the circuit court to follow the decisions of the appellate court." In re A.A., 181 Ill.2d 32, 36, 228 Ill.Dec. 905, 690 N.E.2d 980 (1998); see also People v. Harris, 123 Ill.2d 113, 128, 122 Ill. Dec. 76, 526 N.E.2d 335 (1988) ("[i]t is fundamental in Illinois that the decisions of an appellate court are binding precedent on all circuit courts regardless of locale"). If a circuit court "entertains genuine doubt about the continued vitality of a reviewing court decision," the proper manner in which to proceed in a complex or protracted case is to rule in accordance with existing law and to enter a Rule 304(a) (155 Ill. 2d R. 304(a)) finding or certify the question for interlocutory appeal under Rule 308 (134 Ill.2d R. 308). Because of our system of precedent the circuit court is not, however, free to disregard binding authority. State Farm Fire & Casualty Co. v. Yapejian, 152 Ill.2d 533, 539-40, 178 Ill.Dec. 745, 605 N.E.2d 539 (1992).
However, we note that the decisions in B.S. and I.D. were based on the premise that the appropriate standard of scrutiny for evaluating due process and equal protection challenges to section 1(D)(p) was the "rational basis" test. B.S., 317 Ill. App.3d at 663, 251 Ill.Dec. 323, 740 N.E.2d 404; I.D., 205 Ill.App.3d at 549, 151 Ill. Dec. 94, 563 N.E.2d 1200. The decision in J.S. merely quoted the analysis of the I.D. court. See J.S., 213 Ill.App.3d at 131, 156 Ill.Dec. 723, 571 N.E.2d 507. As we shall later discuss, the fundamental nature of the rights inherent in the parent-child relationship compel the conclusion that the statute must instead withstand strict constitutional scrutiny. This matter is deserving of clarification, and accordingly we shall review the circuit court's decision, addressing in turn each of the constitutional infirmities D.C. raises.

I. Due Process

A. Vagueness

First, D.C. contends that section 1(D)(p) is unconstitutionally vague in that it fails to define the term "parental responsibilities." A vagueness challenge is actually a contention that the statute violates the due process clause, because due process requires that a statute "`give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" Russell v. Department of Natural Resources, *1239 183 Ill.2d 434, 442, 233 Ill.Dec. 782, 701 N.E.2d 1056 (1998), quoting Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222, 227 (1972). A legislative act which is so vague, indefinite and uncertain that the courts are unable, by accepted rules of construction, to determine with any reasonable degree of certainty what the legislature intended will be declared to be void. R.W. Dunteman, 181 Ill.2d at 163, 229 Ill.Dec. 533, 692 N.E.2d 306. However, an act is not unconstitutionally vague merely because one can conjure up a hypothetical which brings the meaning of some terms into question. Gem Electronics of Monmouth, Inc. v. Department of Revenue, 183 Ill.2d 470, 481, 234 Ill.Dec. 189, 702 N.E.2d 529 (1998). When considering a vagueness challenge to a statute, a court considers not only the language used, but also the legislative objective and the evil the statute is designed to remedy. R.W. Dunteman, 181 Ill.2d at 163, 229 Ill.Dec. 533, 692 N.E.2d 306.
It is an established rule that "`"[v]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."'" Russell, 183 Ill.2d at 442, 233 Ill.Dec. 782, 701 N.E.2d 1056, quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 1191 n. 7, 71 L.Ed.2d 362, 369 n. 7 (1982), quoting United States v. Mazurie, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706, 713 (1975). The first amendment is not implicated in this case. Thus, D.C. cannot contend that section 1(D)(p) is vague on its face if it clearly applies to her. Russell, 183 Ill.2d at 442, 233 Ill.Dec. 782, 701 N.E.2d 1056; see People v. Jihan, 127 Ill.2d 379, 386, 130 Ill.Dec. 422, 537 N.E.2d 751 (1989). The question is thus whether D.C. clearly falls within the scope of the statute.
One might wonder how we will determine whether the statute is unconstitutionally vague as applied to D.C., when there has been no fact-finding in the case. The question answers itselfwe cannot. Nor could the circuit court have done so. Thus it was inappropriate for the circuit court to declare the statute vague. As this was a civil case, not involving the first amendment, the vagueness challenge could not properly have been resolved except by application to the facts of the case. The circuit court's determination that the statute was unconstitutionally vague was premature and must be reversed. "`Although it is possible that specific future applications... may engender concrete problems of constitutional dimension, it will be time enough to consider any such problems when they arise.'" Flipside, 455 U.S. at 504, 102 S.Ct. at 1196, 71 L.Ed.2d at 375, quoting Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 52, 86 S.Ct. 1254, 1265,16 L.Ed.2d 336, 348 (1966).[1]

*1240 B. Procedural Due Process-Burden of Proof

D.C. raises additional due process challenges to section 1(D)(p). She contends that, as the circuit court held, the statute violates procedural due process because it alters the burden of proof for termination of parental rights to something less than "clear and convincing evidence." On this issue D.C. finds fault with the statutory language which requires "competent evidence" of mental disability and "sufficient justification" to believe that the disability will extend beyond a reasonable time period.
The parties agree that a decision to terminate parental rights must be supported by clear and convincing evidence. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re Adoption of Syck, 138 Ill.2d 255, 275, 149 Ill.Dec. 710, 562 N.E.2d 174 (1990) ("because of the devastating effect produced by a termination of parental rights, the evidence of a parent's unfitness has to be clear and convincing"). However, nothing in section 1(D)(p) purports to alter this requirement. Section 1 of the Adoption Act is merely a definitional section. Section 1(D) defines an "unfit person" and enumerates, in its various subsections, the possible grounds of unfitness. None of the various subsections of section 1(D) dictate the burden of proving unfitness.[2] Rather, the burden of proof in adoption proceedings is set forth in section 8 of the Adoption Act (750 ILCS 50/8 (West 1998)). That section clearly states that to obviate the requirement of a consent or surrender to adoption, on the grounds that the person is unfit as defined in section 1 of the Adoption Act, the person must be proven to be unfit "by clear and convincing evidence." 750 ILCS 50/8(a)(1) (West 1998).[3] We see no evidence of legislative intent that this requirement not apply to the particular definition of unfitness set out in section 1(D)(p). The requirement that the evidence of mental unfitness be "competent" refers to the type of evidence, not the quantum, nor does the word "sufficient" *1241 connote any particular burden of proof. Accordingly, we reject D.C.'s procedural due process challenge.

C. Substantive Due Process

D.C. also asserts that section 1(D)(p) violates substantive due process, because it allows a parent to be declared unfit without any showing that the parent has neglected or harmed his or her child or that harm is imminent; and because it does not require the court to consider "lesser alternatives to terminating parental rights." We find no merit to either contention.
Before addressing the specifics of either challenge, we must determine the type of review in which we are to engage. The analysis courts use when confronted with a claim that a statute violates the due process guarantees of the United States and Illinois Constitutions depends on the nature of the right upon which the statute supposedly infringes. Ordinarily, courts will employ a relaxed scrutiny of statutes, looking only to see whether the statute bears a rational relationship to a legitimate state interest. Tully v. Edgar, 171 Ill.2d 297, 304, 215 Ill.Dec. 646, 664 N.E.2d 43 (1996). However, in cases where the right infringed upon is among those considered a "fundamental" constitutional right, courts subject the statute to "strict" scrutiny. To survive strict scrutiny the means employed by the legislature must be "necessary" to a "compelling" state interest, and the statute must be narrowly tailored thereto, i.e., the legislature must use the least restrictive means consistent with the attainment of its goal. Tully, 171 Ill.2d at 304-05, 215 Ill.Dec. 646, 664 N.E.2d 43.
Thus, in order to analyze D.C.'s due process challenge, we must first determine whether section 1(D)(p) impinges on a fundamental constitutional right. The United States Supreme Court has recently addressed this issue, in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). There, the Court reiterated that a parent's right to control the upbringing of his or her children is a fundamental constitutional right. See Troxel, 530 U.S. at 65, 120 S.Ct. at 2060, 147 L.Ed.2d at 56 (plurality opinion) ("the interest of parents in the care, custody, and control of their children-is perhaps the oldest of the fundamental liberty interests recognized by this Court"); 530 U.S. at 77, 120 S.Ct. at 2066, 147 L.Ed.2d at 63 (Souter, J., concurring) ("a parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment"); 530 U.S. at 80, 120 S.Ct. at 2068, 147 L.Ed.2d at 65 (Thomas, J., concurring) (recognizing that the Court's prior case law establishes that "parents have a fundamental constitutional right to rear their children"); 530 U.S. at 87, 120 S.Ct. at 2071, 147 L.Ed.2d at 69 (Stevens, J., dissenting) ("[o]ur cases leave no doubt that parents have a fundamental liberty interest in caring for and guiding their children"); 530 U.S. at 95, 120 S.Ct. at 2076, 147 L.Ed.2d at 74 (Kennedy, J., dissenting) ("there is a beginning point that commands general, perhaps unanimous, agreement in our separate opinions: As our case law has developed, the custodial parent has a constitutional right to determine, without undue interference by the State, how best to raise, nurture, and educate the child[, which] stems from the liberty protected by the Due Process Clause of the Fourteenth Amendment"). Accordingly, we must employ strict scrutiny, and determine whether section 1(D)(p) is necessary to a compelling state interest and narrowly tailored thereto. To the extent that the appellate court decisions in B.S., I.D., and J.S. hold or suggest that the statute must merely survive rational relation scrutiny, they are overruled.

*1242 1. Finding of Harm
We first consider D.C.'s argument that the statute is constitutionally infirm for allowing a parent to be declared unfit without proving that the parent has, or is about to, neglect or harm the child. We have upheld article III of the Juvenile Court Act, the minors requiring authoritative intervention (MRAI) statute (705 ILCS 405/3-1 et seq. (West 1998)), against an identical argument. In People v. R.G., 131 Ill.2d 328, 137 Ill.Dec. 588, 546 N.E.2d 533 (1989), we reviewed a ruling by the circuit court that a portion of the MRAI statute was unconstitutional. The provision in question concerned what should be done with a child who had run away from home and been taken into limited custody by the state for interim crisis intervention services. The statute required the state, for a limited time, to keep the child in custody and refuse any demands by parents to return the child to them if the child refused to return home. See 705 ILCS 405/3-3 (West 1998). The circuit court held that the state's general interest in the welfare of minors was not sufficiently compelling to satisfy strict scrutiny, because some runaways, specifically those who went to the "safe and secure family home" of a friend or relative, would not be in danger of harm. The circuit court concluded that the state could not assert a compelling interest sufficient to satisfy the MRAI statute without conducting an individualized assessment of risk for each minor sought to be protected under the MRAI statute.
We rejected the circuit court's reasoning, holding that a child's safety and welfare were always jeopardized by running away from home. We noted that "[e]ven if the minor finds refuge with a relative or friend, the minor's welfare could still be in jeopardy because the minor may not be receiving proper care there." R.G., 131 Ill.2d at 346, 137 Ill.Dec. 588, 546 N.E.2d 533. Thus, no individualized assessment of risk was required.
Our analysis in R.G. supports a similar conclusion in this case. Section 1(D)(p) does not, of course, allow a finding of unfitness based on a mere showing of mental impairment, illness, or retardation. Rather, the person's mental condition must render him unable to discharge his parental responsibilities and the inability to discharge parental responsibilities must "extend beyond a reasonable time period." 750 ILCS 50/1(D)(p) (West 1994). By definition, a child who is being raised by a person who is unable to discharge his parental responsibilities might not "receiv[e] proper care." It was precisely this possibility which was found sufficiently compelling to uphold the MRAI statute in R.G. See R.G., 131 Ill.2d at 346, 137 Ill.Dec. 588, 546 N.E.2d 533. The parties in this case do not dispute that the state, as parens patriae, has a compelling interest in protecting the welfare of children in general, nor would we accept such an argument. See R.G., 131 Ill.2d at 344, 137 Ill.Dec. 588, 546 N.E.2d 533, citing Ginsberg v. New York, 390 U.S. 629, 638-41, 88 S.Ct. 1274, 1279-81, 20 L.Ed.2d 195, 203-04 (1968); Stanley v. Illinois, 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551, 559 (1972); Santosky v. Kramer, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599, 615 (1982); Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 2504-05, 61 L.Ed.2d 101, 119 (1979); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652-53 (1944). We find that the state's interest in protecting minors is sufficiently compelling to satisfy strict due process scrutiny when a child is being raised by a parent who is, and will remain, for an unreasonable time, mentally unable to give the child proper care.

*1243 2. Less Restrictive Alternatives and Related Arguments
D.C. also contends that section 1(D)(p) violates due process because it does not require the court to consider less restrictive alternatives to termination of parental rights. In two related arguments, D.C. contends that the statute is infirm because it does not require proof that the inability to discharge parental responsibilities be related to the parent's mental condition or proof that the mental condition cannot be treated. We reject this group of arguments as well.
First, we find no merit to the contention that the statute violates due process because it does not require that the inability to discharge parental responsibilities be related to the mental condition. The statute requires proof of inability to discharge parental responsibilities "supported by" competent evidence of the mental condition. 750 ILCS 50/1(D)(p) (West 1998). It is clear from the statutory language that the mental condition must be the cause of the inability to discharge parental responsibilities which forms the basis for the finding of unfitness. We see no basis for confusion on the face of the statute and D.C. brings to our attention no authority indicating that there has been the slightest uncertainty on this point.
Nor does the statute require the court to ignore evidence that the mental condition may be treated. Clearly, the likelihood of successful treatment of the mental condition should inform the determination of whether the inability to discharge parental responsibilities will continue "beyond a reasonable time." Again, we are unaware of any confusion on this point after a review of the authority interpreting the statute. D.C. has not brought to our attention any court having refused to consider evidence of treatment options. However, the existence of a treatment for the mental condition will not uniformly preclude a finding of unfitness under section 1(D)(p). It may be, for example, that although a treatment exists, the likelihood of the patient successfully undergoing the treatment is extremely dim; or the treatment might take such a long time that the trial court could justifiably find that the inability to discharge responsibilities would continue beyond a reasonable time notwithstanding the treatment. See In re R.M., 219 Ill.App.3d 747, 751, 162 Ill.Dec. 256, 579 N.E.2d 1070 (1991) (upholding trial court's finding of unfitness despite testimony that condition might be treatable, where treatment would last four to seven "or more" years and prognosis was "not good"). Clearly this is not an exhaustive list of the factors which might influence the trial court's determination. We merely wish to indicate that although section 1(D)(p) does not explicitly mention treatment, the possibility of treatment can and should be taken into account under the statute as written, although it might not by itself be determinative of the outcome in all cases.
The same is true of evidence that, notwithstanding the persistence of the parent's mental condition, the parent might become able to discharge his parental responsibilities with proper training or other services. The future focus of the statute is not the persistence of the parent's mental condition, but his inability to discharge his parental responsibilities. Thus evidence demonstrating that the parent could become able to discharge his responsibilities should be considered, even in the absence of evidence that the germinal mental condition could itself be cured or eradicated.
We reject D.C.'s larger "less restrictive alternatives" argument as well. The legislature has provided that the Adoption Act and the Juvenile Court Act are to be construed in concert with each other. 750 *1244 ILCS 50/2.1 (West 1998). Section 20a of the Adoption Act provides that in construction and interpretation of that act the "best interests and welfare of the person to be adopted shall be of paramount consideration." 750 ILCS 50/20a (West 1998). The Juvenile Court Act is more specific in this regard; the purpose of that enactment is to
"secure for each minor subject hereto such care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal * * *." 705 ILCS 405/1-2(1) (West 1998).
It is apparent that the preferred result under the Juvenile Court Act is that a child remain in his or her home, in the custody of his or her parents. This is a clarification of the child's best interests. As the Adoption Act and the Juvenile Court Act are to be construed in concert with each other, it is apparent that termination of parental rights should not be the default option in proceedings under the Adoption Act in which a parent contests an allegation of unfitness. We believe the courts of Illinois are already sensitive to this concern. See, e.g., In re A.J., 269 Ill.App.3d 824, 828, 207 Ill.Dec. 152, 646 N.E.2d 1239 (1994) ("[c]ourts do not, and indeed should not, lightly terminate parental rights or summarily dismiss a mentally ill person's rights"). Nevertheless, once a court has found by clear and convincing evidence that a parent is unfit, the state's interest in protecting the child is sufficiently compelling to allow the termination of parental rights.

II. Equal Protection
D.C.'s final argument is that section 1(D)(p) violates the constitutional guarantee of equal protection under the law in two respects. First, she contends that the statute impermissibly distinguishes between parents who are unable to discharge parental responsibilities because of mental conditions and parents who are unable to discharge their responsibilities for other reasons. Second, she contends that the legislature has violated equal protection by failing to provide parents whose rights are sought to be terminated under the Adoption Act with the benefits afforded to "identically situated" parents under the Juvenile Court Act.
The protection provided by the equal protection clauses of the United States and the Illinois Constitutions is identical. A.A., 181 Ill.2d at 36-37, 228 Ill.Dec. 905, 690 N.E.2d 980. The guarantee of equal protection requires that the government treat similarly situated individuals in a similar manner. Thus, the government may not accord different treatment to persons who have been placed by statute into different classes on the basis of criteria wholly unrelated to the purpose of legislation. However, the equal protection clause does not forbid the legislature from drawing proper distinctions in legislation among different categories of people. The level of scrutiny applied in reviewing legislative classifications under the equal protection guarantee depends on the nature of the classification; for purposes of this case it suffices to note that courts apply strict scrutiny to classifications affecting fundamental rights. A.A., 181 Ill.2d at 37, 228 Ill.Dec. 905, 690 N.E.2d 980. To survive strict scrutiny in the equal protection context, as in due process analysis, the means employed by the legislature must be necessary to advance a compelling state interest, and the statute must be narrowly tailored to the *1245 attainment of the legislative goal. In re Estate of Hicks, 174 Ill.2d 433, 438, 221 Ill.Dec. 182, 675 N.E.2d 89 (1996). An equal protection violation is remediable by equal treatment, which may be accomplished by extension of benefits to the excluded class or withdrawal of benefits from the favored class. Heckler v. Mathews, 465 U.S. 728, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984).
The first equal protection challenge raised by D.C. is that section 1(D)(p) impermissibly distinguishes between parents who are unable to discharge parental responsibilities because of mental conditions and parents who are unable to discharge their responsibilities for other reasons. D.C. contends that only parents with a mental impairment may have their rights terminated based on their inability to discharge parental responsibilities, whereas parents without a mental impairment cannot have their parental rights terminated because of their inability to discharge their parental responsibility. D.C. contends that persons who are unable to discharge their parental responsibilities form an identically situated group and that there is no sound basis for dividing this group based on the "status" of having a mental impairment.
D.C. bases this argument on the premise that section 1(D)(p) does not require that the mental impairment cause the inability to discharge parental responsibilities. As we have previously discussed, however, the statute does require a causational link. Accordingly, the statute does not treat identically situated persons differently. One set of persons who may be found unfit are persons who, because of a mental condition, are unable to discharge parental responsibilities and will remain unable to do so for more than a reasonable time. This group is not similarly situated to persons who are not mentally unable to discharge their parental responsibilities. We find no fault with the legislative determination that persons who are and will remain mentally unable to discharge parental responsibilities may be declared unfit.
D.C.'s other equal protection challenge is that parents facing the loss of their parental rights are treated differently depending on whether their fitness is challenged under the Juvenile Court Act or the Adoption Act. D.C. contends that the statutory scheme cannot survive strict scrutiny because identically situated parents are entitled to services from the state in Juvenile Court Act proceedings but not in Adoption Act proceedings. Specifically, D.C. notes that section 2-10 of the Juvenile Court Act requires the Department of Children and Family Services (DCFS) to make "reasonable efforts" to eliminate the necessity of removing a minor from the parents' home, efforts which are to include the "provision of services" to the minor or his family to ameliorate the situation requiring the minor's removal. See 705 ILCS 405/2-10 (West 1998). D.C. contends that parents whose parental rights are questioned in an Adoption Act proceeding are entitled to no such benefits, and accordingly they are treated differently despite being identically situated.
D.C. has not carried her burden (see Arangold, 187 Ill.2d at 351, 240 Ill.Dec. 710, 718 N.E.2d 191) of clearly establishing a constitutional violation. As previously noted, the guarantee of equal protection only requires that the legislature treat similarly situated individuals in a similar manner. A.A., 181 Ill.2d at 37, 228 Ill.Dec. 905, 690 N.E.2d 980. An examination of the statutory provision upon which D.C. relies reveals that D.C. is not similarly situated to persons receiving the services which that statute provides. Section 2-10 of the Juvenile Court Act governs temporary shelter care hearings, not hearings regarding termination of parental rights. The state services mandated therein are *1246 provided in the context of the state removing a minor from his or her home based merely on a finding of probable cause to believe that the minor is abused, neglected or dependent. 705 ILCS 405/2-10(2) (West 1998). Such a procedure is not even contemplated under the Adoption Act. Accordingly, section 2-10 cannot be said to grant services which similarly situated persons would not receive under the Adoption Act, because no persons will be similarly situated under the Adoption Act. In the instant case the State did not take R.C. from D.C.'s custody against her will; D.C. voluntarily surrendered temporary custody of her child to Lutheran for adoption placement purposes. The situation in this case is not analogous to the state placing a child in shelter care, and D.C. lacks standing to raise an equal protection argument based on facts other than those present in her case. Bruso v. Alexian Brothers Hospital, 178 Ill.2d 445, 460, 227 Ill.Dec. 532, 687 N.E.2d 1014 (1997) (to have standing to raise an equal protection claim, the party must be a member of the class against whom the statute allegedly discriminates); People v. Jaudon, 307 Ill. App.3d 427, 435-36, 241 Ill.Dec. 76, 718 N.E.2d 647 (1999) (a party has no standing to assert the constitutional rights of others not before the court).

CONCLUSION
For the reasons above stated, the order of the circuit court declaring section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 1998)) unconstitutional is reversed, and this cause is remanded to the circuit court for further proceedings.
Reversed and remanded.
Justice GARMAN took no part in the consideration or decision of this case.
NOTES
[1] We recognize that in addition to the factual scenario we have presented as background, the record does contain additional materials concerning the nature and duration of D.C.'s mental illness, including medical records. However, even taking these materials into account it would be inappropriate to determine at this juncture whether the statute is unconstitutionally vague as applied to D.C. First and foremost, this court is not a finder of fact. There has been no determination even of what D.C.'s condition is, much less how her condition will affect her ability to discharge her parental responsibilities or for how long any inability to discharge her responsibilities might continue. Serious due process concerns would be raised if we were to determine that the statute could constitutionally be applied to D.C. when there has not even been a hearing, or a chance for D.C. to present any evidence, regarding any of these facts. Cf. East St. Louis Federation of Teachers, Local 1220 v. East St. Louis School District No. 189 Financial Oversight Panel, 178 Ill.2d 399, 419, 227 Ill.Dec. 568, 687 N.E.2d 1050 (1997) (although due process is flexible, its fundamental requirement is the opportunity to be heard at a meaningful time and in a meaningful manner).

Moreover, even were we willing to engage in an as-applied analysis assuming the truth of the psychiatric labels applied to D.C. in the record, there are differing diagnoses. For example, the record contains two reports by Dr. Archibald Hutchinson, one a "discharge summary" with an apparent date of January 1995 and the next a "history and physical" dated February 1995. The first refers to D.C. as a "known case of chronic schizophrenia, chronic undifferentiated type," while the second document labels her a "well-known case of bipolar disorder." Moreover, so far as we are aware, the record contains no psychiatric analysis of what effect D.C.'s condition might have on her ability to parent. There are not sufficient facts in the record to determine whether D.C. "clearly" falls within the statute (see Russell, 183 Ill.2d at 442, 233 Ill.Dec. 782, 701 N.E.2d 1056), and accordingly we express no opinion on this question.
[2] Some subsections of section 1(D) do mention burdens of proof, but in no instance does section 1(D) prescribe a burden of proof of unfitness in the adoption proceeding. One subsection requires that a certain burden of proof have been met in prior proceedings, when the result of the prior proceeding is being relied upon to establish unfitness (750 ILCS 50/1(D)(f) (West 1998)), while others refer to the burden of proof necessary for the parent to overcome presumptions of unfitness (750 ILCS 50/1(D)(i), (D)(m-1), (D)(n) (West 1998)). But none of the various subsections purport to establish the burden of proof which must be met to establish unfitness in the adoption proceeding.
[3] An allegation that a parent is unfit, as defined in section 1 of the Adoption Act, must also be proven by clear and convincing evidence in proceedings under the Juvenile Court Act of 1987. See 705 ILCS 405/2-29(2) (West 1998).