2022 IL App (1st) 211232-U

THIRD DIVISION
March 23, 2022

No. 1-21-1232

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| IN THE INTEREST OF: C.C., Jr., a Minor, | ) | |
| | ) | |
| Minor-Respondent-Appellee, | ) | Appeal from the |
| | ) | Circuit Court of |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | 20-JA-8235 |
| | ) | |
| v. | ) | Honorable |
| | ) | Peter Vilkelis, |
| J.C., | ) | Judge Presiding |
| | ) | |
| Mother-Respondent-Appellant.) | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Trial court made explicit factual findings that mother's positive drug tests, coupled with father's refusal to comply with caseworkers or necessary services, rendered parents unable to properly care for minor. Court's finding was not against manifest weight of evidence.

¶ 2    The mother, J.C., appeals an order from the trial court that removed her minor child,

C.C., Jr., from her custody because she was unable to care for the minor. The minor was

removed from the custody of his father, too—the mother's husband—but the father is not a party to this appeal. We will refer to the minor, mother, and father as such throughout this appeal.

¶ 3    The mother raises two claims of error: (1) the trial court's order did not contain explicit factual findings explaining the bases for removal, as required by law, and (2) the trial court's findings were against the manifest weight of the evidence.

¶ 4    We find that the trial court's findings were sufficiently explicit. And while we find the case to have been a close one, we cannot say that the trial court's findings were against the manifest weight of the evidence. We thus affirm.

¶ 5                                BACKGROUND

¶ 6    In May 2020, a neighbor called Chicago police and said that a young child (the minor) was alone in a stroller outside and crying. He had been there for about 45 minutes, the neighbor said, but nobody seemed to be taking care of him or answering his pleas. Two Chicago police officers went to the house; they found the minor alone but unhurt. In the doorway of the house, a woman later identified as the mother was passed out, apparently intoxicated on alcohol. The father was inside but either had not heard the child crying or, in any event, did not take care of him.

¶ 7    The next day, a DCFS investigator met with the mother, who again was intoxicated. She told the investigator she had an alcohol problem and had relapsed the day before. The father would not allow the investigator into the home and refused to take a drug test. The mother had a history of mental health and substance abuse issues. At the time, she took methadone to address a history of opiate abuse issues. She also had been previously diagnosed with attention deficit hyperactivity and anxiety disorders.

2

¶ 8      This incident was the mother's third contact with DCFS, thus generating a "c-sequence" report by DCFS. The "a-sequence" report of the first incident is not in the record. The second incident, generating a "b-sequence" report, occurred in December 2019, when the mother was found to be under the influence and falling asleep while caring for the minor. As we will discuss below, this "c-sequence" report in May 2020 was the first that caused DCFS to refer the mother and her child to the court's attention.

¶ 9                          I. The mother enters treatment

¶ 10     The Department of Children and Family Services (DCFS) filed a motion for temporary custody and petition for adjudication of wardship. The adjudication hearing would not take place for another year, but the court heard the motion for temporary custody immediately. The court found probable cause that the minor was abused or neglected and ordered DCFS to take temporary custody of him. DCFS placed the minor outside the home while the mother found a residential center to begin treatment.

¶ 11     A month later, in June 2020, the mother had entered an impatient treatment center, where she received substance abuse and mental health treatment. The program allowed for the child to live with her while she received treatment, so the court amended the previous order and reunited the minor with his mother. The court also entered an order of protection under section 2-25 of the Juvenile Court Act, requiring the mother to submit to random drug testing and complete her treatment. See 705 ILCS 405/2-25 (West 2020). The court indicated that, if the mother completed the inpatient substance abuse treatment, she and the minor could reside together in a recovery home.

¶ 12     Proceedings on DCFS's petition for adjudication of wardship remained on hold while the court monitored the mother's progress. The mother successfully completed the impatient

treatment, then intensive outpatient at the recovery home. The minor remained with her during this time and, by all accounts, was well-provided for and received all the necessary care, including therapy and medical treatment to help with a vision problem.

¶ 13    By November 2020, the mother had completed both inpatient and intensive outpatient treatment and was in a less-intensive outpatient program but still living in a recovery home with her son. She was testing negative for all illegal substances and alcohol, engaged in services with Haymarket, and—in the words of Gleni Martinez, her caseworker—had become a "leader" in her groups. The father, however, was refusing services, including drug testing and a substance abuse evaluation.

¶ 14    The mother said she would stay at the recovery home until February 2021, then wanted to move back home with her husband. However, the court warned her that if her husband continued to refuse services, it would not allow her or her son to move back in with him.

¶ 15                              II. The mother and minor return home

¶ 16    The court held a status hearing on February 19, 2021. The mother was scheduled to leave the recovery home the next day, and she still wanted to move back in with her husband. The court noted that it was still concerned that the father was being uncooperative, but that it had received a letter from the father's therapist saying that he started therapy in October 2020 and had been diagnosed with depression and anxiety.

¶ 17    Martinez told the court that the father still refused to consistently submit to drug testing and was refusing any references for substance abuse evaluations. He was, however, in a parenting education class at a local hospital.

¶ 18    The mother told the court she wanted to go home to her husband and believed he would support her efforts to stay sober. She planned to continue attending recovery meetings and

4

taking methadone. The father apologized to the court and said that his life had been turned "upside down" after the May 2020 incident.

¶ 19    Despite expressing some reservations and over the objections of the DCFS and the minor's guardian *ad litem* (GAL), the court modified the order of protection to allow the mother and minor to return home. The court was pleased with the mother's progress, though it also ordered both parents to comply with services and be regularly tested for drugs.

¶ 20    In March 2021, Martinez told the court that the mother and minor had returned home with the father. Martinez visited them regularly; the home appeared appropriate and there were no unusual incidents. The mother had been prescribed Adderall, an amphetamine, by her psychiatrist to help manage her ADHD, and she was attending individual and virtual recovery meetings. Martinez's only concern was the Adderall prescription, given the mother's previous struggles with addiction. Martinez had tried to speak to the mother's psychiatrist, and the mother had signed a release to allow her psychiatrist to speak to Martinez, but he was not willing to talk.

¶ 21    III. First motion to violate the order of protection

¶ 22    In May 2021, the GAL filed a motion alleging that the mother violated the order of protection. The GAL alleged that the mother's urine tested positive for alcohol on March 31, 2021. At a hearing, the mother admitted she violated the order and indicated that she had been attending recovery meetings since that positive test. The court found that the order had been violated but did not take any other action. It reminded the mother she needed to stay sober.

¶ 23    IV. The adjudicatory hearing

¶ 24    In June 2021, the parties resumed proceedings on the neglect-and-abuse petition filed back in May 2020 and held an adjudicatory hearing. See 705 ILCS 405/2-21 (West 2020). The parties stipulated to evidence regarding the May 2020 incident, and the court found that the

minor was neglected for being in an injurious environment but not abused.

¶ 25                    V. The second motion to violate and positive drug tests

¶ 26       On July 9, 2021, the GAL filed a second motion alleging the father had violated the order of protection by refusing to submit to drug testing. The GAL asked the court to find the order had been violated but did not ask that it be vacated or that the child be removed from the home.

¶ 27       Five days later, the court held a dispositional hearing. See 725 ILCS 405/2-22 (West 2020). Kristy Kolzow, the supervisor of the mother's outpatient substance abuse program, testified that the mother had been enrolled in programing since April 2021. The mother was prescribed methadone and Adderall but had tested positive for methamphetamine a total of seven times since starting treatment. But the results were inconsistent; sometimes the mother tested negative for methamphetamine a day or two after testing positive. Kolzow said that the mother's behavior did not change after she tested positive for methamphetamine, which is why the positive test was "off putting" to her.

¶ 28       Kolzow said she asked the mother if the positive result could have been because she had taken drugs she bought off the street, but the mother told her that she only took the medications she was prescribed. Kolzow said she wanted to gather more information to see if the Adderall prescription was causing the positive result. Kolzow also wanted to speak to the mother's psychiatrist but could not, despite the mother signing an information release.

¶ 29       Otherwise, the mother was doing very well in the program. Kolzow said she was "very open and honest" in her therapy sessions.

¶ 30       Martinez, the caseworker, said she had visited the home several times and saw no signs the minor was being abused or neglected. The minor was in daycare and receiving

occupational and speech therapy, and the mother was taking him to all of his scheduled appointments. His daycare provider did not have any concerns about his wellbeing, either. The mother was seeing a therapist, Martinez said, and although he could not meet with her on a weekly basis, the psychiatrist had not expressed any concerns. The mother continued seeing a psychiatrist, taking her prescribed medications and attending rehab meetings, and she was employed full-time in the kitchen at the residential treatment center that had treated her earlier in this case. In total, she seemed to be doing well.

¶ 31    Martinez said the father still was not cooperating with random drug testing but had twice tested negative when voluntarily tested. A few days before the hearing, he refused to submit to a saliva test and was hostile toward her. He was involved in therapy sessions, however.

¶ 32    The trial judge decided to make the minor a ward of the court, but found both the mother and father fit, willing, and able to care for the minor. But the court also found that the father's refusal to submit to random drug testing violated the order of protection. Again, the court expressed frustration that the father was being difficult and warned him that it would remove the child from the home if the father did not cooperate. The court converted the previous order of protection into an order of protective supervision (705 ILCS 405/2-24 (West 2020)), with the minor to remain in his parents' custody. The protective supervision order included the same requirements as the previous protection order, including drug testing and sobriety.

¶ 33                     VI. More positive tests and the August hearings

¶ 34    In August, the GAL filed a new motion to vacate the protective supervision order. It alleged the mother tested positive once for fentanyl, and again for methamphetamines on several occasions. The GAL requested that the mother submit to a hair-follicle drug test to get a detailed and historical understanding of what substances she had taken.

¶ 35    On August 18, 2021, the court heard evidence on the motion. Martinez said that the mother was still in an intensive outpatient substance abuse program. She said that, on July 26, 2021, the mother's urine tested positive for norfentanyl and methamphetamine. Three days later, the mother's urine tested positive for fentanyl and methamphetamine. (These would turn out to be the only positive tests for fentanyl or norfentanyl.)

¶ 36    Martinez wondered if the mother's prescribed medications might be creating false positives on the test, as did Kolzow.  Entered into evidence were several emails from an individual bearing the title of "clinical support manager" at the lab that conducted the testing, stating that pharmaceutically prescribed Adderall, though an amphetamine, "is not known to contain methamphetamine as an impurity."

¶ 37     Martinez admitted that she was confused, because the mother's tests were "different every time." Her most recent drops did not test positive for methamphetamine, fentanyl, or norfentanyl, Martinez said. And despite the earlier positive tests, the mother was still attending her therapy sessions and, by all indications, succeeding in them. She also was employed full-time. The minor, meanwhile, was going to daycare regularly and receiving any necessary therapy and services; there was no indication of neglect.

¶ 38    Martinez recommended the mother take a hair-follicle test, which hopefully would provide a "more clear scope" of the substances the mother may have taken. The court agreed, noting that the positive fentanyl test result was the one with which it was "most concerned." Without objecting, the mother offered to submit to the test.

¶ 39    Martinez recommended the minor be placed with a "safe family" provider outside of the parents' home, based on the mother's positive tests and the father's uncooperative behavior. But the court decided to wait for the results of the hair-follicle test before making any decisions.

¶ 40    On August 26, the parties returned to court. By now, the results of the hair-follicle test had come back. The test results were positive for methamphetamine. But they were negative for opiates (including fentanyl). And notably, the results were negative for *amphetamines*, as well, despite the fact, conceded by all parties, that the mother had been taking Adderall—an amphetamine—routinely for months.

¶ 41     Martinez had spoken with the testing lab, and they reiterated that none of the mother's prescribed medications would have caused the positive methamphetamine result. That said, the mother was still working full-time, and nobody at the minor's daycare or his developmental therapists had any concerns about his well-being.

¶ 42    Martinez said she had recently spoken to one of the minor's caseworkers, who had visited the house on August 24 to assess if the minor needed visual development services. That caseworker said the mother was cooperative but had to leave early to go to the dentist. The father, however, had difficulty expressing his thoughts and staying awake. This concerned Martinez, and she again recommended the minor be removed from the parents' house and placed with a safe family, again based on the mother's positive test and the father's behavior during the caseworker's assessment.

¶ 43    Kolzow said that the mother was still attending all of her substance abuse group and individual therapy meetings, and that she was very cooperative with the program. She said she did not believe the minor was in any danger, but she did not know why the mother tested positive for fentanyl. Kolzow admitted the level of fentanyl for which the mother tested positive was low, and she was unsure if the mother had taken fentanyl accidentally or may have had a positive result from a recent colonoscopy.

¶ 44 The court ultimately found both parents unable to care for the minor. In doing so, it again expressed frustration at the father's attitude, saying that his "obstinate attitude in this case is an issue." The court also said that the mother's positive hair test for methamphetamine, along with the previous positive for fentanyl, concerned it. Although she was a "likeable person," the court was concerned with the speculative explanations for the positive tests. It found that the parents had violated the order of protective supervision and placed the minor in the custody and guardianship of DCFS, allowing the agency to place the minor.

¶ 45                                   ANALYSIS

¶ 46 Article II of the Juvenile Court Act governs proceedings involving abused, neglected, and dependent minors. 705 ILCS 405/2-1 *et seq.* (West 2020).

¶ 47 Section 2-27 governs removal and placement of abused and neglected minors whose parents are found unfit or unable to care for the minor after a dispositional hearing. 705 ILCS 405/2-27 (West 2020). The court may remove a child from their parents' custody if it finds the mother and father are, for reasons other than financial ones, unable, unwilling, or unfit to care for, protect, train, or discipline their child. See *id*. § 2-27. The section's purpose is not to terminate parental rights, but rather to "decide what future actions are in the best interest of the child and whether to make the child a ward of the court." *In re Madison H.*, 215 Ill. 2d 364, 374 (2005).

¶ 48 Before finding a parent unfit or unable to care for the minor, the court must "put[] in writing the factual basis" for its decision. 705 ILCS 405/2-27(1) (West 2020). The writing requirement of Section 2-27(1) "exists to give the parties notice of the reasons forming the basis of the removal of the child and to preserve this reasoning for appellate review." *Madison H.*, 215 Ill. 2d at 374. Explicit oral findings stated during the dispositional hearing, once transcribed,

10

provide an opportunity to review the validity of the findings on appeal and thus are sufficient to satisfy the writing requirement, provided that the oral record "is explicit and advises the parties for the basis of the court's decision." *Id.* at 377.

¶ 49        This is where the mother's first point of error comes in. She claims that the trial court did not adequately explain the basis for its ruling. Whether the trial court complied with a statutory requirement to make findings of fact is a question of law we review *de novo*. *In re Aaron R.*, 387 Ill. App. 3d 1130, 1137 (2009) (deciding whether trial court made certain factual findings before terminating wardship, as required by section 2-31(2) of Juvenile Court Act).

¶ 50        But first, DCFS and the GAL claim that the mother has forfeited any challenge to the adequacy of the court's factual findings. It is true that the mother did not object in the trial court or in a post-judgment motion that the court's findings did not satisfy Section 2-27(1), resulting in forfeiture. See *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996). But we will review this issue for two reasons. First, forfeiture is a limitation on the parties, not this court. *In re Michael H.*, 392 Ill. App. 3d 965, 970 (2009). More to the point, when "the well-being of a child and parental rights are at issue," our supreme court has elected not to apply the forfeiture rule and instead address the merits of this precise issue. *Madison H.*, 215 Ill. 2d at 371. The same being true here, we choose to address the mother's challenge.

¶ 51        Here, the only written order the court entered was a standardized dispositional order. But we have a series of transcripts reflecting the court's reasons stated in open court for our review, which suffices for a written explanation under *Madison H.*, 215 Ill. 2d at 377.

¶ 52        At the August 26 hearing on the Guardian's motion to violation the order of protection, the court stated:

"I have been struggling mightily to keep this family intact. I have made findings on previous court dates that the order of protection was violated, but I didn't vacate it.

I admonished [the father] in July—I've admonished [the father] repeatedly. On June 10 we made our adjudicatory findings, dispositional findings were made on July 14th, 2021, where this Court found both parents to be fit, willing and able to care for, protect, train, discipline the minor, and the minor was allowed to stay in the care and custody of the parents pursuant to an order of protection.

And as I stated back then, that [the father's] obstinate attitude in this case is an issue. And based on the testimony—based on the evidence that [the mother] tested positive in the hair follicle test for methamphetamine without really any explanation and the previous tests for fentanyl, all the explanations that are being given for these positive tests, in this Court's view, are just speculations.

[The mother] is obviously a likeable person, people believe in her and they like her, and she's doing well at her job. But this Court today finds that this order of protection has, in fact, been violated today."

¶ 53 The court then found both parents unable to care for the minor and made DCFS the minor's custodian and guardian, with the right to place him.

¶ 54 At the end of the hearing, the court added this: "If [the mother] is willing to go into an inpatient program that would allow her to have the minor with her, the Court would be willing to amend the order today to allow that to happen."

12

¶ 55    The mother says this record is an insufficient factual basis to satisfy Section 2-27. As the GAL notes, however, in the court's written order vacating the order of supervision, it noted that its finding was also based on the evidence presented at the August 18 hearing.

¶ 56    At that hearing just over a week earlier, the GAL presented evidence of the mother's previous positive drug tests for methamphetamine, as well as one positive test each for fentanyl and norfentanyl. So when the court made its ruling on August 26, it also took into consideration what it had previously considered. See *In re S.H.*, 2018 IL App (3d) 170357, ¶ 18 (court's reference to "other proceedings" where respondent was found unfit to care for her children provided adequate factual basis for instant determination of unfitness).

¶ 57    We do not need to guess why the court decided that the mother was unable to take care of the minor: her husband had repeatedly refused to cooperate with the caseworkers and complete the necessary services, and the mother had tested positive for illegal substances. This is not like *Madison H.*, 215 Ill. 2d at 378, where the court simply recited the standard, made mention of unspecified "concerns," and filled out a preprinted form dispositional order with no factual basis. The court's statement here was factually specific and adequately explained to the mother the basis for its decision.

¶ 58    As far back as November 2020, the court warned the mother that if her husband did not get the necessary services, it would not allow her and the minor to live with him. In February 2021, right before the mother left the recovery home, the court again warned the father he needed to comply, even though the court was going to allow the mother and minor to return home.

¶ 59    Throughout the summer—and about the time the mother's drug tests began to show questionable results—the father continued to be, in the court's word, "obstinate." By the time August came around, the father was still refusing to be drug tested regularly and was not

cooperating with the caseworkers. Both in August and before, the court warned him and the mother that the father's stubbornness could cost him custody of the child, even if the mother was doing well and staying sober. See *In re Edward T.*, 343 Ill.App.3d 778, 800 (2003) (court could consider respondent-parent's living arrangements when considering child's best interests, even if parent was cooperating with programming.)

¶ 60        Insofar as the mother was concerned, the court had warned her back in March 2021, after she tested positive for alcohol, that further positive drug tests could lead to the removal of the minor from her custody. The court gave her more chances in both May and July 2021, after additional positive test results for methamphetamine. The court expressed great concern over these tests at the August 18 hearing and, after the results of the hair-follicle test showed a positive result for methamphetamine, finally decided that it was time to vacate the protection order and place the child outside the home.

¶ 61        And we return to that final statement the court made—that if the mother was willing to enter an in-patient treatment program that allowed her to keep the minor with her, the court would be willing to take that route. This, again, makes it clear that the perceived addiction relapses, coupled with the presence of the unwilling father, were the driving forces behind the decision.

¶ 62        All of these findings are contained within the written record, mostly in the form of transcripts of oral findings made by the court, but in writing no less. It is clear that the minor was removed because the father refused to cooperate and some of the mother's drug tests continued to come back positive, even after the court had warned her and given her multiple chances. We find no violation of the writing requirement of section 2-27(1).

¶ 63        That leads to the mother's second argument, that the trial court's findings were

14

erroneous. We review the court's findings for manifest error. Manifest error is a clearly evident, plain, and indisputable error. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). A decision is against the manifest weight of the evidence if the facts clearly demonstrate that the court should have reached the opposite result. *In re N.B.*, 191 Ill. 2d 338, 346-37 (2000).

¶ 64      Based on the evidence, much of which we have already recounted, we are unable to conclude that the trial court's findings were manifestly erroneous. As we noted above, concerns about the father, alone, can serve as a basis for removal if the father remains in the home with the mother and child. See *In re Edward T.*, 343 Ill. App. 3d at 800; see also *In re S.S.,* 313 Ill. App. 3d 121, 129 (2000) ("very important" to consider behavior of others living in the home along with parent seeking custody of minor). And the concerns about the father were well-supported.

¶ 65      As for the mother, the numerous positive test results, inconsistent and somewhat curious as they may be, provided cause for the court to fear that the mother might be on the verge of relapse. The court was not required to wait for a full relapse, and perhaps another May 2020 incident, before taking action.

¶ 66      We acknowledge that this is a difficult case for many reasons, as it was for the trial court, which noted correctly that it had "struggle[ed] mightily to keep this family intact." The court had been tolerant and patient with the mother despite multiple positive drug test results. The court clearly had at the forefront of its thinking our supreme court's reminder that "the preferred result under the Juvenile Court Act is that a child remain in his or her home, in the custody of his or her parents." *In re R.C.*, 195 Ill. 2d 291, 308 (2001).

¶ 67      One reason this case is not an easy one is that the positive test results strike us—as they did the two principal witnesses, Kolzow and Martinez—as curious. For one, the mother had struggled with alcohol and opioids, not methamphetamine. For another, as the witnesses noted,

15

the results did not show a consistent pattern of either sobriety or insobriety; they were, as Martinez put it, "different every time." Third, the results were "off putting," to use Kolzow's phrase, to both Kolzow and Martinez, considering that the mother did not appear to be showing any other signs of relapse—she was holding down employment with flying colors, attending therapy, and showing no signs of relapse in that therapy. And most importantly of all, there were no concerns that the minor had been anything but well cared for throughout this time period; the mother was taking him to his various therapy sessions, and he was thriving at daycare.

¶ 68    Hovering over all of these test results, including the hair-follicle test, was the fact that the mother was testing positive for methamphetamine and was also routinely taking an amphetamine, Adderall. The mother's position is that, given the similarity in the makeup of amphetamines and methamphetamines, the evidence suggests a false positive test for methamphetamine. The GAL and DCFS, on the other hand, point to the email exchanges and phone conversations with the lab, assuring Martinez and Kolzow that pharmaceutically prescribed Adderall contains no trace of methamphetamine. And as noted earlier, there is the rather bizarre result from the hair-follicle test, where the mother tested *negative* for a drug she admits taking—Adderall, an amphetamine—and *positive* for a closely-related drug she *denies* taking—methamphetamine.

¶ 69    The GAL suggests one possibility that could make sense of all this, one suggested by the clinical support manager at the lab, as well: the mother was taking an amphetamine but not her pharmaceutically prescribed Adderall. In other words, she was buying amphetamines off the street, drugs that could have been mixed with other drugs such as methamphetamine or fentanyl.

¶ 70    This court, of course, is unable to know the true answer. We are anything but experts in pharmacology, and no such expert (at least no one qualified as an expert) presented evidence

below. We can only say that the evidence about these drug test results was conflicting; the trial court waded through the evidence; and the court concluded that it believed those positive results. On this record, we cannot say that the opposite conclusion was clearly evident. We cannot find manifest error.

¶ 71    Though we understand that the court did what it felt compelled to do under the circumstances, and we find no error in that determination, we remain hopeful, as the trial court clearly does, that a reunion of mother and child might be possible in the near future. And we would add that, if similar drug tests of a rather curious nature and pattern should occur again, the trial court would be well served by the parties presenting more concrete evidence about the potential (or lack thereof) for false positives based on the medications the mother is prescribed— more concrete, that is, than hearsay testimony about what a lab employee emailed or told a therapist or caseworker over the phone. The court correctly noted that it could not rely on "speculation" about false positives absent something more concrete.

¶ 72                                    CONCLUSION

¶ 73    The judgment of the circuit court is affirmed.

¶ 74    Affirmed.