*In re* JARON Z. *et al.*, Minors, Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee, v. Lynette H.F., Respondent-Appellant).

First District (6th Division)    No. 1—03—0286

▮▮▮▮▮▮▮

Opinion filed May 7, 2004.

James A. Rolfes, Tracy A. Gregar, and Myra A. Marcaurelle, all of Sachnoff & Weaver, Ltd., of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Nancy Kisicki, and Nancy Faulls, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Charles P. Golbert and Elizabeth A. Di Cola, of counsel), guardian *ad litem*.

JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Respondent Lynette H.F. (respondent) appeals from two companion orders finding her to be an unfit parent and terminating her parental rights to two of her minor children, Jaron Z. (Jaron) and Raven H. (Raven).[1] On appeal, respondent makes several contentions asserting error by the trial court. The State and the children's public guardian have filed appellees' briefs. For the following reasons, we affirm.

## BACKGROUND

Jaron was born prematurely to respondent in August 1993, with several medical problems. At birth, Jaron required a tracheotomy tube and a breathing monitor. He was nonverbal until the age of four and has been diagnosed with mild cerebral palsy. He is currently labeled a "special needs child," has behavioral problems including attention deficit hyperactivity disorder (ADHD), and participates in several different therapy and special education programs. Raven was born to respondent drug-exposed in July 1995. Raven too has been labeled a "special needs child": she has severe cerebral palsy, is nonverbal, is not toilet-trained and requires occupational, physical, speech and developmental therapies.

Respondent's family was first brought to the attention of the Department of Children and Family Services (DCFS) when Raven was born. At that time, both Raven and respondent tested positive for a controlled substance. DCFS allowed Jaron and Raven to remain with respondent, but put a family service plan in place requiring that respondent participate in an inpatient drug treatment program. Respondent refused to comply and later overdosed on a controlled substance and was hospitalized. Jaron (then 3½ years old) and Raven (then 10 months old) were placed in foster care. In May 1996, the

---

[1]Respondent has five children: in addition to Jaron and Raven, she has an adult daughter, a minor daughter who is without special needs and is not at issue in this appeal, and an infant son who died while in the custody of the Department of Children and Family Services several years ago. Raven has been referred to throughout these proceedings as both Raven H. and Raven G. Although the caption of this cause uses "Raven H.," respondent alerts us in her reply brief that the proper reference should be "Raven G." Also, we note that Jaron and Raven have the same biological father, Sedale Z. His parental rights were involuntarily terminated; he has not appealed that decision and is not a party to the instant appeal.

State filed petitions for adjudication of wardship and motions for temporary custody, based on Jaron and Raven's injurious environment and risk for physical injury. The trial court entered a temporary custody hearing order, finding probable cause that Jaron and Raven were neglected as well as the "urgent and immediate" need to remove them from respondent's care. DCFS placed the children with relatives.

The trial court held a formal adjudicatory hearing on October 21, 1996, and entered an adjudication order with respect to both children. In that order, the court found that Raven had been born drug-exposed and that both children were neglected and living in an injurious environment while in respondent's custody. On January 6, 1997, the court entered a disposition order finding respondent unable to care for Jaron and Raven and her attempts at reunification to have been unsuccessful. The court declared the children wards of the court, terminated temporary custody and appointed DCFS as the children's guardian. Because Jaron and Raven's relatives could no longer care for them, the children were separated and moved into treatment foster homes to assist with their special needs.

In May 1997, respondent entered an 18-month intensive inpatient and outpatient drug treatment program, as originally recommended by DCFS. She was also entitled to weekly visits with Jaron and Raven, but did not attend these visits consistently for some time. In January 1998, the trial court entered a permanency order, with a goal of "return home" of the children to respondent within 12 months, as she had made "substantial progress" through treatment. In the following months, respondent obtained unsupervised and overnight visitation with the children; Raven was returned home in October 1999 and Jaron was returned home in December 1999, with the court finding respondent "fit, able, and willing to care" for them. However, the court instituted orders of protection with each return, requiring respondent to refrain from drug use, submit to random drug screens and attend counseling.

At this time, respondent's household was composed of three children (Jaron, Raven and her other minor daughter) and Byron Freeman (the father of the minor daughter). Respondent married Freeman in February 2000 and was the children's primary caretaker. In-home and out-of-home services were provided by several agencies to assist respondent. On March 15, 2000, respondent relapsed and violated the terms of Jaron and Raven's orders of protection by using cocaine.[2] Respondent admitted her relapse to DCFS during a

---

[2]Respondent's relapse was brought to the attention of DCFS by her husband, Byron Freeman.

subsequent interview. The trial court found that respondent had violated the orders of protection, but determined that because Freeman was in the home, the children were not in imminent danger and, thus, should not be immediately removed. A plan was implemented requiring respondent to again remain drug free, submit to drug screens, and attend weekly Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings, as well as counseling and therapy.

In the following weeks, respondent failed to attend two drug screens and tested positive for cocaine during a third. On May 31, 2000, the trial court ordered another drug screen for respondent, which also tested positive. On this date, the trial court vacated the previous orders of protection for Jaron and Raven because respondent had violated them, found probable cause that these children were neglected, and determined that there was an immediate urgency and need to remove them from her care. Jaron and Raven were again placed in their nonrelative treatment foster homes, and eventually, on November 2, 2000, the court entered a modified disposition order finding respondent unable to care for them and her reunification attempts unsuccessful. The court terminated temporary custody and placed the children in DCFS guardianship. Respondent was ordered to participate in a psychological assessment, complete both intensive and multiweek inpatient and then outpatient drug treatment programs, attend NA/AA and therapy meetings, and submit to random drug screens.

Between June and October 2000, respondent split from her husband and became homeless. She did not have consistent contact with her caseworkers and did not participate in any of the ordered programs, except for the psychological assessment, which determined that she was in need of intensive inpatient drug treatment. In June 2000, she failed to attend two drug screens and tested positive for cocaine at a third. In July 2000, she again tested positive and entered a three-day detoxification program. After completing that program, she did not participate in her aftercare regimen and tested positive a few days later. She missed another drug screen in August 2000, entered a second detoxification program (lasting two days) in mid-September 2000, and tested positive again after completing it. She failed to participate in the program's aftercare. In October 2000, she tested positive. She entered a third detoxification program, which was to last seven days. Respondent missed two days, did not complete her aftercare, and again tested positive after being discharged. She also declined an opening with a different treatment program and admitted to being an "active" drug abuser through October 2000.

In late October 2000, respondent left her neighborhood, obtained a seasonal job, and went to live at a women's shelter where she became

a house manager. In January 2001, she enrolled in an intensive outpatient therapy program, which met five times a week. Respondent was scheduled to finish this program in March 2001. She failed to attend two days in January 2001, ten days in February 2001 and three of the first nine days in March 2001. Respondent was placed "on contract" (*i.e.*, supervision) and was told she would be dropped from the program if her absenteeism continued. At this point, respondent began attending meetings and completed the program in April 2001. As part of her aftercare, respondent was ordered to attend 90 NA/AA meetings in 90 days. Respondent failed to do so.

In June 2001, respondent moved back in with her husband and their minor daughter. The trial court entered a permanency order, finding that respondent had not made substantial progress toward the return home of Jaron and Raven, and had only started "in earnest" to comply with previously ordered requirements in March 2001. In October 2001, the State sought appointment of guardianship with consent to adoption, asking the trial court to find respondent unfit and to terminate her parental rights. The State premised its allegations under sections 1(D)(b), (D)(k) and (D)(m) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(k), (D)(m) (West 2002)), asserting that respondent failed to maintain a reasonable degree of interest, concern or responsibility as to Jaron and Raven's welfare; failed to make reasonable efforts to correct the conditions that were the basis of their removal within nine months after the adjudicatory hearing or within any nine-month period thereafter; failed to make reasonable progress toward return of the children within nine months after the adjudicatory hearing or within any nine-month period thereafter; and had been addicted to drugs for at least one year immediately prior to commencement of these proceedings. Respondent filed a demand for particulars, asking that the State identify the "exact dates" for the alleged nine-month period in which she failed to make reasonable efforts to correct the conditions or reasonable progress toward return home of the children. The State moved to strike the demand and the trial court agreed.

The trial court held a fitness hearing in October 2002. Three witnesses testified for the State.[3] Meg O'Rourke testified that she was the social worker in charge of Jaron and Raven's case from June 1999 to

---

[3]The testimony provided by all the witnesses who took the stand in this matter is lengthy and repetitive of much of the history with respect to Jaron and Raven's case as already outlined here. Accordingly, we recount this testimony in brief, highlighting only pertinent or additional information relevant to our disposition on appeal.

June 2000, and then became the supervisor of the social worker assigned to the case from June 2000 to August 2001. She stated that after the children were first brought to the attention of social workers, respondent was ordered to participate in inpatient drug treatment but failed to do so for some 10 months, whereupon the children were removed from her care. The children were later returned, but after respondent admitted to relapsing through cocaine use, O'Rourke began conducting weekly home visits and ordered drug screens, two of which respondent failed to attend and a third at which she tested positive. Respondent was then ordered to attend intensive inpatient and then outpatient treatment and NA/AA meetings. O'Rourke testified that during this time, respondent did not stay in contact with her, did not complete the treatments and was not visiting Jaron or Raven "consistently." Respondent began some treatment in 1998, and the children were returned to her in late 1999 with social work services in place to help respondent with the children's special needs. O'Rourke stated that the children were then removed at the end of May 2000 because respondent admitted to cocaine use again and tested positive during a drug screen. Respondent was then ordered to participate in various treatment programs, including outpatient treatment; she did not complete this treatment at that time, telling O'Rourke that she felt she did not need it. While the service plan instituted by O'Rourke had a goal of "return home," respondent had an overall rating of "unsatisfactory" due to her failure to maintain contact with her social worker, attend drug screens and NA/AA meetings and refrain from substance abuse. O'Rourke further testified that respondent ultimately completed an outpatient program in April 2001, but has never completed an inpatient program. At the treatment program respondent did participate in, she was labeled "manipulative and not engaged." She only began consistent weekly visits with Jaron and Raven in February 2001.

Jennifer Bala, Jaron and Raven's social worker from June 2000 to October 2001, testified that respondent did not complete any of the required treatment programs outlined for her in the summer of 2000, after the children had been removed the second time. During that summer and fall, respondent either missed or tested positive at several drug screens, and her visits with the children were "pretty inconsistent," amounting to only four visits in three months. Bala testified that she supervised the visits respondent had with the children. Respondent brought food and gifts, and the children sometimes stated that they wanted to visit her and go home with her. Bala also stated, however, that during the visits Raven would "retreat" into a "baby-like state" and Jaron would be "very angry" and disobedient toward

respondent. With respect to the outpatient program respondent completed during early 2001, Bala noted that respondent missed several meetings and never participated in inpatient treatment as ordered. Although respondent began visiting her children regularly and participated in aftercare treatment, she did not begin attending the ordered NA/AA meetings until March 2001.

Tina Dorow, Jaron's therapist since March 2000, testified that respondent has an attachment with the children, loves them, and has helped them through therapy at some points. Dorow further testified that she offered respondent therapy in June, September, and November 2000 and January 2001, but respondent refused each time, telling Dorow "she knew how to stay clean."

The parties stipulated that respondent has not tested positive for drugs since January 2001. After the State rested but before respondent presented her case in chief, respondent moved for a directed finding with respect to the allegations based on sections 1(D)(k) (habitual drunkenness/drug addiction) and 1(D)(m) (failure to make reasonable efforts within a nine-month period). The court asked the State what nine-month period it was examining when dealing with respondent's progress toward "reasonable efforts," whether this was the nine months after the 1996 adjudication of neglect, and what effect if any the return of the children to her in 1999 had on this statutory period. The State told the court:

> "The nine month period is from March of 2000, until December of 2000. Treatment didn't start until January of 2001."

The court granted respondent's motion for directed finding with respect to section 1(D)(k), but denied it with respect to section 1(D)(m).

Respondent then began her case in chief, presenting five witnesses and testifying on her own behalf. Tenishia Williamson, a counselor at the outpatient program respondent completed in April 2001, testified that respondent missed several days during the program, including two days in January 2001, ten days in February 2001 and three days in March 2001 whereupon she was placed on supervision. Respondent should have completed the program in March 2001, but did not finish until April 2001. Williamson stated that respondent missed these days due to her duties at the shelter where she was "house manager."

Deidra Hearn, an employee of the shelter, testified that respondent was homeless when she arrived at the shelter and was eventually promoted to "house manager," a full-time position which entailed chores and the supervision of other residents. Hearn stated that respondent had been referred to counseling and other treatment in early 2001 and would have been excused from her chores to attend

these programs by the shelter's supervisor if she had so requested. Gayle Campell, another employee of the shelter, testified that she has had contact with respondent since 1997 when she entered the 18-month drug program after the children were first removed from her home. Campell stated that respondent attended parenting classes, twice obtained seasonal employment at a department store, and acted appropriately with the children.

Freeman, respondent's husband, testified that he worked nights, leaving respondent to be the primary caretaker of Jaron, Raven and their other minor daughter. While the home was "[v]ery busy, very constant," Freeman stated that "it was manageable." He had not seen respondent use drugs in December 1999 when Jaron and Raven had been returned. However, respondent began using again in March 2000. He notified social workers, split from respondent and took custody of their minor daughter. He also testified that he was present for most of the visits respondent had with Jaron and Raven, and that respondent acted appropriately and bonded with them. She never attended a visit under the influence of drugs or alcohol. He further testified that while he never saw respondent actually take drugs, he assumed that this was so due to changes he observed in her behavior.

Tiffany Harrison, respondent's adult daughter, testified that respondent took care of Jaron after he was born and visited him every day while he was in the hospital, and took Raven to therapy every day. Harrison stated that while the children were living in the relative foster home after first being removed, respondent would visit and do "motherly things" such as change diapers and clean clothes. She denied ever seeing respondent "high" or leaving the children unattended. She further testified that she visits Jaron and Raven once a month and respondent accompanies her, and that the children "act like they were never separated from" respondent, who brings them toys, clothes and food. Harrison testified that Raven plays with no one but respondent and cries when the visits are over, and that Jaron asked her if he could "come home" to respondent.

Respondent testified that she was a "recovering drug addict," that she smoked crack cocaine regularly between July 2000 and October 2000, and that she last used cocaine in October 2000. She stated that Jaron and Raven were first removed to relative foster care in May 1996 when she was using cocaine, but that she saw them every day. She did not begin receiving treatment until a year later, whereupon she participated in an 18-month inpatient program. Jaron and Raven were returned in late 1999. Respondent testified that she relapsed in March 2000 while the children were in her care, using cocaine "about three times" between March 2000 and May 31, 2000, when she tested

positive and the children were removed again. She used cocaine because she felt "frustrated" and because the social work agencies had "set [her] up to fail." She was then homeless until September 2000, when she entered a shelter and eventually became house manager. Her psychological assessment recommended she attend an inpatient drug treatment program, but she entered multiple detoxification programs instead. Respondent admitted that she did not perform any ordered aftercare treatments from these programs. She then participated in another program in January 2001, but she was placed on supervision due to her absences, which respondent attributed to her duties as house manager at the shelter. Respondent was also ordered to attend 90 NA/AA meetings in 90 days, but did not do so.

Respondent stated that she visited Jaron and Raven once a month during October 2000 and June 2001, but also stated that she was entitled to weekly visits during that time and participated in every visit. She then admitted missing visits and declining to participate in therapy sessions offered to her by therapist Dorow. She testified that she helps the children during the visits, teaching Raven sign language. Respondent admitted to missing several drug screens and that at least two were positive, even after she had completed detoxification programs. She blamed the positive results on cocaine being left in her "system." She denied missing or testing positive for other drops, and denied that social workers ordered an inpatient program or aftercare following her outpatient treatment. She considered herself "cured" of her addiction as of March 2001.

Respondent rested her case. The court then continued the matter for argument, asking the State to address "what nine month period or periods" it was asking it to consider wherein respondent failed to make "reasonable efforts." When the State offered to make its argument at that time, the court declined and asked the parties to present it with any case law addressing whether a court could consider the time period when the children were home with respondent after their initial removal.

The court reconvened on January 28, 2003; none of the parties offered case law to the court with respect to whether it could consider the time between when the children were returned home in December 1999 and before respondent relapsed in March 2000 as part of the nine-month period, although the State argued that the court could consider it while respondent argued that it could not. The State told the court that a different nine-month period it could consider, without involving any consideration of the time during which the children lived with respondent, was between May 31, 2000 (when the children were removed for the second time), and February 2001.

With respect to the allegations under section 1(D)(m) of the Adoption Act, the court noted that the adjudication of neglect in this cause was rendered on October 21, 1996, and thus, it could look to the first nine months after this date or any other nine-month period thereafter. The court commented that it had not received any evidence concerning the first nine months, so it would not consider this time. The court then stated that the period of time it would look to was from March 15, 2000 (when respondent relapsed), to December 15, 2000, to determine if respondent made "reasonable progress" under section 1(D)(m). While the court concluded that respondent was somewhat cooperative, she did not begin participating in intensive treatment as ordered until January 2001, "well beyond the 9 month period." Moreover, the court noted that even though respondent had "formally" enrolled in a treatment program at that time, "she missed meetings[, s]he missed appointments[,] *** she was about to be discharged from the *** program as of March." Thus, the court stated that respondent did not "actually [make] the progress that was necessary" until March 2001, when she had been placed on supervision and finally began attending the program consistently. This was "well beyond the December 15th cut-off date *** [and] a whole year after she first started using in March of 2000." The court also held that if it could not consider the time during which the children were home with respondent as part of the nine-month period, then even during the alternative nine-month period after their removal on May 31, 2000, to February 2001, respondent had still not made reasonable progress under section 1(D)(m). This was because respondent admitted to using drugs until October 2000, and as noted earlier, she did not make the "necessary" progress in her treatment until March 2001, again after the operative "cut-off date."

With respect to section 1(D)(b), the court stated that respondent visited her children often and showed concern and interest toward them when she did see them. The court concluded, however, that she "failed to show a reasonable degree of responsibility" toward their welfare due to her continued use of cocaine while they lived with her and her "reluctance" to enter and complete a treatment program, waiting until March 2001. Based on these findings, the court declared respondent unfit and began a best interests hearing.

During the best interests hearing, therapist Dorow testified that she would recommend the termination of respondent's rights to Jaron and Raven for "four reasons." Dorow stated that although Jaron has commented that he wants to go home, his actions during play therapy show he feels "something bad" will happen if he is returned and he is not engaged in his family. Dorow next noted that the children have

lived little of their lives with respondent; Jaron, who was with respondent longer, lived only 27 months of his 9-year life with her. Third, Dorow testified that respondent cannot meet the children's special needs, "showing in visits *** that she has a hard time tolerating" and accepting the children's moods and behaviors. Finally, Dorow noted that the children need permanency, which they have found with their foster parents. While Dorow anticipated that termination would be "difficult" and even "devastating" for the children, she testified that this was in their best interests.

Andreas Buehler testified that he was the social worker assigned to the children's case in January 2003. Based on his observations, the foster homes where the children resided were "safe and appropriate," and the children had "healthy" and "respecting" relationships with their foster parents, who were able to and had been meeting their special needs. While Jaron had stated to Buehler he wanted to live with respondent, he also stated that he wanted to live with his foster parent as well. The children were bonded with their foster families, both of which told Buehler they would seek adoption of Jaron and Raven if this was available. Buehler recommended that respondent's parental rights be terminated due to her history of substance abuse, her relapse while the children were in her care, and the length of time the children had been in foster care.

Delivia Ware, Raven's foster mother, testified that Raven has lived with her for six years. In addition to Raven, Ware has one biological child, one adopted child and one foster child whom she is adopting. Two of these children have special needs, and like Raven, require several therapies. Ware testified that Raven has been with her all her life, that she can meet her needs, that she takes Raven on outings and to her appointments, and that Raven has a "real bond" with her family. Ware stated that she also has a good relationship with Jaron's foster mother and would maintain sibling visits between Raven and Jaron. Deborah Haynes, Jaron's foster mother, testified that Jaron had lived with her for three years and in that time, his grades have risen "tenfold," he has learned to play musical instruments, he participates in Boy Scouts and he loves to travel.

Respondent also testified at this hearing. She stated that she visits Jaron and Raven once a month and that Jaron told her several times that he wants to live with her. Respondent averred that she has participated in speech therapy for Jaron, has gone to group sessions with him, and that she knows how to care for both children. Respondent testified that she currently attends NA/AA meetings, participates in random drug screens and is not using drugs.

While making its best interests determination, the court noted

that it had participated in this cause since 1996 shortly after the children's births, and that the children had been in DCFS custody since that time with the exception of only a few months when they were at home with respondent. The court commented that respondent's relapse was "not just a minor slip but a regress into the lifestyle that caused these children to come into care to begin with," since she did not stop using drugs until well after the children were removed a second time, "violat[ing] [the] trust" that was allowed her when the children were not immediately removed. The court also looked to the special needs of the children as well as the difficulty termination may have on them, but stated that, in view of the entirety of the case, it "would not want to risk[,] given the present circumstances," returning these children to respondent. Thus, the court entered an order finding respondent unfit pursuant to sections 1(D)(b) for her failure "to maintain a reasonable degree of responsibility, interest or concern as to the child[ren]'s welfare," and 1(D)(m) for her failure "to make reasonable efforts to correct the conditions which were the basis for removal within any 9 months after adjudication," declaring it in the best interests of the children to terminate respondent's parental rights, and appointing a guardian with the right to consent to the children's adoptions.

## ANALYSIS

On appeal, respondent asserts several different allegations of error on the part of the trial court when disposing of this cause. These include: (1) that the trial court did not have jurisdiction to terminate her parental rights since it erred in not conducting a second adjudicatory hearing after the children were removed from her care the second time; (2) that the trial court erred in adjudicating respondent unfit under sections 1(D)(m)(i) and (D)(m)(ii)[4] of the Adoption Act; (3) that section 1(D)(m)(iii) of the Adoption Act is unconstitutional; (4) that even if section 1(D)(m)(iii) is constitutional, the court's finding that she was unfit pursuant to this section was against the manifest weight of the evidence; (5) that the court's finding that respondent violated section 1(D)(b) was against the manifest weight of the evidence; and (6) that the court's finding that termination of her rights was in the best interest of the children must be reversed because the court ignored statutory factors and this finding was against the manifest,

---

[4]In addition to an alleged error under both these sections of the statute, respondent devotes a portion of her brief to challenging the sufficiency of the evidence presented against her with respect to section 1(D)(m)(i). Because this second portion in essence mimics the first portion with respect to both sections 1(D)(m)(i) and (D)(m)(ii), we treat them as one argument.

weight of the evidence. We now address each of respondent's arguments.

## I. Second Adjudication

■ Respondent's first contention on appeal is that the trial court in the instant cause lacked jurisdiction to terminate her parental rights. She asserts that the court omitted "a crucial step" in the termination process when it failed to adjudicate Jaron and Raven "neglected" again, after they were removed from her care for the second time. She claims that this rendered all subsequent proceedings "infirm," divested the court of jurisdiction and precluded the State from seeking a determination of unfitness under the Adoption Act. She also insists that because the children were returned to her custody, any subsequent neglect proceeding necessarily had to be commenced anew, as any reliance on the original neglect adjudication date would have been "fundamentally unfair" because it was rendered so long ago. We disagree.

As a threshold matter, we note that respondent has waived this argument for our review. Respondent concedes as much in her reply brief on appeal. She notes that she never raised this claim at any point during the proceedings below. The dispositional order definitively removing the children and finding her unable to care for them was entered by the trial court on November 2, 2000. Respondent had 30 days from which to appeal this final order; her failure to do so resulted in waiver. See *In re M.J.*, 314 Ill. App. 3d 649, 654-55 (2000) (dispositional order is final order from which appeal properly lies; parent's failure to file notice of appeal therefrom fails to perfect review of that order or of neglect proceedings).

Despite her forfeiture of this issue, respondent urges us to review its merits. Even were we to do so, it is clear that her arguments fail.

Pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act), a trial court has jurisdiction over children who are "abused, neglected or dependent." 705 ILCS 405/2—1 (West 2002). Once the trial court adjudicates a child neglected, it maintains jurisdiction over the case and conducts a dispositional hearing to determine if he should be made a ward of the court and how his needs should be handled. See 705 ILCS 405/2—21, 2—22 (West 2002); see, *e.g., In re Shawn B.*, 218 Ill. App. 3d 374, 381 (1991). During the dispositional hearing, the court examines whether the parent is fit, willing and able to care for the child; if so, the court may choose to issue a dispositional order returning the child to the parent's care. However, the law is clear that the court may modify a dispositional order at any time, since proceedings under the Juvenile Court Act do not terminate unless the child

"ages out" of the juvenile system or the trial court issues an order expressly stating that the case is closed and all proceedings are discharged. See 705 ILCS 405/2—31, 2—21, 2—23 (West 2002) (jurisdiction of trial court over child and to modify related orders continues until child reaches majority or is adopted); see also *Shawn B.*, 218 Ill. App. 3d at 380-81 (trial court has jurisdiction to modify dispositional order at any time); *In re Johnson*, 134 Ill. App. 3d 365, 369 (1985) (trial court's jurisdiction over adjudicated children is "necessarily of a continuing nature"). In fact, it has been held that a child need not be explicitly adjudicated a ward of the court in order to confer jurisdiction upon the court to enter a dispositional order; rather, adjudication of wardship may be implied from the circumstances of a particular case. See 705 ILCS 405/2—23 (West 2002); see, *e.g.*, *In re J.N.*, 91 Ill. 2d 122, 129 (1982).

In the instant case, Jaron and Raven were adjudicated neglected on October 21, 1996. While it is true that they were returned to respondent in December 1999 upon a finding that she was fit and able to care for them, the trial court imposed orders of protection governing their return. When respondent violated these orders by failing to meet any of their requirements and returning to drug use, the court removed the children on May 31, 2000, and entered a modified dispositional order finding her unable to care for them. That the court "skipped directly to" a dispositional hearing rather than conducting a second adjudicatory hearing, as respondent states, is of no consequence in this particular case. It was clearly implied that Jaron and Raven were still under the court's jurisdiction as of May 31, 2000. Between their return and their second removal, the trial court never issued an order expressly closing their case or discharging the proceedings, nor did the children "age out" of the system. Instead, the court had imposed ongoing orders of protection, respondent's violation of which caused it to modify its previous disposition of return home to a new disposition of removal. Accordingly, contrary to respondent's contention, the children's return home did not "reset" the procedural process of this cause or somehow erase the court's original October 1996 adjudication of neglect. That the adjudication occurred years earlier is of no moment, as the trial court possessed a continuing jurisdiction over the children and to modify orders affecting the disposition of their cause.

Ultimately, even if the trial court's failure to conduct a second adjudicatory hearing before the children's second removal was in error, that error did not divest it of jurisdiction to rule upon this cause. See *M.J.*, 314 Ill. App. 3d at 654 (failure by trial court to follow procedural dictates of Juvenile Court Act did not cause it to lose its

jurisdiction over cause); *In re C.S.*, 294 Ill. App. 3d 780, 786 (1998) (any error by trial court in not holding hearing did not render subsequent orders affecting children void for lack of jurisdiction). Therefore, respondent's contention fails.

## II. Sections 1(D)(m)(i) and (D)(m)(ii)
The following is not publishable under Supreme Court Rule 23.

## III. Constitutionality of Section 1(D)(m)(iii)

Respondent's third contention on appeal is that section 1(D)(m)(iii) of the Adoption Act is unconstitutional on its face. Respondent claims that this section violates due process because "it circumvents the requirement that the State prove unfitness by clear and convincing evidence." After discussing the fundamental importance of the right to parent one's own child, respondent asserts that the State's ability to choose any nine-month time period after the initial nine months following an adjudication of neglect in which to examine a parent's fitness, as allowed under subsection (iii), affords no notice to the parent regarding which nine-month period she will be evaluated on and, accordingly, reduces the State's burden of proof in demonstrating the parent's unfitness. Respondent's argument is clearly misplaced.

As a threshold matter, we note that respondent has forfeited this argument on review. As she concedes in her reply brief on appeal, respondent did not object or raise any issue at trial with respect to subsection (iii) or to the State or court's declarations that she was being evaluated under the nine-month time period from March 15, 2000, to December 15, 2000, or alternatively, from May 31, 2000, to February 2001. Respondent never challenged the State's presentation of the evidence outlined above or the court's ruling as to the periods of time on which it was concentrating. Accordingly, respondent's argument is waived. See *In re April C.*, 326 Ill. App. 3d 225, 241-42 (2001) ("[w]here a party fails to make an appropriate objection in the court below, he or she has failed to preserve the question for review and the issue is waived"); accord *In re D.F.*, 332 Ill. App. 3d 112, 121 (2002) (parent waived contention with respect to section 1(D)(m) by failing to object to the time period used by trial court).

Even were we to review respondent's constitutional challenge, as she urges, we find that it has no merit. Foremost, we begin by citing established law, which holds that all statutes are presumed to be constitutional. See *In re R.C.*, 195 Ill. 2d 291, 296 (2001). A party challenging the constitutionality of a statutory section on appeal bears the burden of rebutting this presumption and demonstrating a constitutional violation. See *R.C.*, 195 Ill. 2d at 296. A party asserting a facial challenge to a statute is confronted with the most difficult of

constitutional challenges, since in order to succeed she must establish that no set of circumstances exists under which the statute would be valid. See *In re C.E.*, 161 Ill. 2d 200, 210-11 (1994). As a court of review, our duty is to construe statutes so as to affirm their constitutionality and validity whenever reasonable. See *R.C.*, 195 Ill. 2d at 296.

In *R.C.*, our state supreme court was confronted with a very similar facial challenge to another section of the Adoption Act. There, a parent contended that section 1(D)(p), under which a parent may be declared unfit due to mental illness, violated due process because it altered the burden of proof for termination of parental rights to something less than clear and convincing evidence. Our supreme court disagreed. Reiterating the requirement that a decision to terminate parental rights must be supported by clear and convincing evidence, the *R.C.* court declared that there was nothing in section 1(D)(p) purporting to alter this requirement. See *R.C.*, 195 Ill. 2d at 301 (citing *Santosky v. Kramer*, 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982), which established the clear and convincing standard). The court noted that section 1 of the Adoption Act is merely a definitional section; section 1(D) defines an unfit person and enumerates in its subsections the possible grounds upon which a parent may be held unfit. See *R.C.*, 195 Ill. 2d at 301. However, nothing in section 1(D) or in any of its subsections dictates the burden involved in proving unfitness. See *R.C.*, 195 Ill. 2d at 301. The burden of proof for unfitness, noted the *R.C.* court, is not found in section 1 but, rather, is set forth in section 8 of the Adoption Act, which clearly establishes that a parent may be found unfit based on the grounds listed in section 1 only through " 'clear and convincing evidence.' " *R.C.*, 195 Ill. 2d at 302, quoting 750 ILCS 50/8(a)(1) (West 1998). From this reasoning, the court concluded that there was no merit to the parent's argument of unconstitutionality: there was no evidence that the legislature intended to alter the established burden of proof in section 1(D)(p) with the words used therein. See *R.C.*, 195 Ill. 2d at 302.

The same reasoning used by our supreme court in *R.C.* undeniably applies to the instant case. Subsection (iii) of section 1(D)(m) of the Adoption Act, just like all the other subsections therein, simply provides another ground available to the State in proving a parent's unfitness. The burden of proof upon the State, however, never changes; as set forth in section 8 of the Adoption Act, it remains a "clear and convincing evidence" standard. 750 ILCS 50/1, 8 (West 2002). That the legislature has allowed the State under section 1(D)(m)(iii) to challenge a parent's fitness based on any nine-month period after the end of the initial nine-month period following the adjudication of neglect

does not change the *quantum* of evidence required to be shown by the State in proving unfitness, but only the *type* of evidence upon which it may rely. See *R.C.*, 195 Ill. 2d at 302 (noting that no word used by legislature in subsection connoted any particular, or different, burden of proof). This legislative directive does not connote any particular burden of proof, let alone one that "lessens" the established burden of clear and convincing evidence, as respondent contends. Thus, we find no constitutional infirmities on the face of section 1(D)(m)(iii).

In addition to the facial challenge she makes here, respondent discusses the instant case on a more specific level and tenuously asserts other claims of error. In briefly addressing these, we note that she seemingly makes a claim of vagueness as to section 1(D)(m)(iii), alleging that even though she filed a "bill of particulars" at the outset of her fitness hearing, she was never told the exact nine-month period upon which she was being evaluated until the State's closing argument, at which point she could not present a meaningful "defense." However, the record belies her assertions. It is true that respondent filed a bill of particulars, asking the State to tell her the exact nine-month period on which it would be concentrating. The trial court denied the bill. Respondent did not appeal from this decision, nor has she included in the record a transcript of the court's ruling on this motion, as she was required to do to perfect our review. See 166 Ill. 2d R. 323; 155 Ill. 2d R. 366. Moreover, contrary to respondent's claims, the record is clear that she indeed knew which nine-month period was at issue well before the State's closing argument. This is because, immediately after the State rested its case in chief and before respondent began hers, the court asked the State on which nine-month period it was basing its allegations of unfitness. The State replied "from March of 2000, until December of 2000."

While respondent would be correct in noting that the State told the court during its closing argument that the court could also look to the nine months between May 31, 2000, and February 2001, respondent takes this statement out of context. The court had earlier asked the parties whether it could consider the time in which the children lived with respondent (from December 1999 until their second removal on May 31, 2000), but neither side presented any case law. The court believed that it could consider this time and thus declared that the nine-month period it would consider for allegations under section 1(D)(m)(iii) would be, as the State had insisted before respondent presented her case, March 2000 to December 2000. It was only as an alternative to this period that the court reasoned the nine months between May 31, 2000, and February 2001 would also support its finding of unfitness. Thus, based on our review of the record, we find that

respondent did know the nine-month period at issue (March 2000 to December 2000) within ample time to present her defense.

Moreover, any assertion of "vagueness" respondent may make in relation to section 1(D)(m)(iii) would fail. Looking to the facts of the case at hand, we find that the terms regarding the applicable statutory time period, as contained in this subsection, are in no way subject to a vagueness challenge. See *R.C.*, 195 Ill. 2d at 298-300 (noting that a vagueness challenge which does not involve first amendment concerns must be conducted based on an examination in light of the facts of that particular case). In our view, the section is clear with respect to the applicable time: a parent's actions for a fitness determination may be examined in light of any nine-month increment of time beginning following the expiration of the first nine-month period after the adjudication of neglect. See 750 ILCS 50/1(D)(m)(iii) (West 2002). Furthermore, respondent failed before the trial court, and fails now on appeal, to state how she was prejudiced, if at all, by the application of section 1(D)(m)(iii) to her cause. See generally *In re L.M.*, 205 Ill. App. 3d 497 (1990). She made no offer of proof at trial, nor does she assert a basis before us, regarding what different evidence she would have presented or argument she would have made that would have changed the outcome here. See *Edward Don Co. v. Industrial Comm'n*, 344 Ill. App. 3d 643, 653 (2003) (party who fails to make offer of proof as to evidence it intended to introduce waives any challenge with respect to that evidence). Rather, there was no material dispute as to the evidence that was presented or as to the time frames attributed to this evidence by the parties.

Therefore, we find no validity with respect to respondent's facial challenge to the constitutionality of section 1(D)(m)(iii).

### IV. Trial Court's Findings Under Section 1(D)(m)(iii)
The following is not publishable under Supreme Court Rule 23.

### V. Trial Court's Findings Under Section 1(D)(b)
Respondent's next contention on appeal is that the trial court's finding of unfitness based on section 1(D)(b) of the Adoption Act was against the manifest weight of the evidence. She asserts that the evidence clearly demonstrated that she showed a reasonable degree of interest, concern and responsibility toward Jaron and Raven while they were in foster care: she overcame her drug addiction; completed drug treatment programs; took cardiopulmonary resuscitation, parenting and sign language classes; and attended therapy appointments and scheduled visits with the children. Respondent further asserts that even after her relapse, the evidence manifestly supports her claim: she entered detoxification, became a house manager at a shelter,

participated in outpatient and aftercare programs, and has remained drug-free. Respondent claims that, in light of her "remarkable efforts," even the trial court commented she showed interest and concern toward Jaron and Raven, and she insists that any missed visits or lack of immediate progress does not weigh in favor of the termination of her parental rights. Based on the record, we disagree.

■ The grounds for finding parental unfitness under section 1(D) of the Adoption Act stand independently of each other. See *In re E.O.*, 311 Ill. App. 3d 720, 726 (2000). Thus, even were we to ignore our determination above that the evidence was sufficient to support the allegations under subsection (m)(iii), we may affirm the trial court's finding of unfitness under its conclusions with respect to subsection (b). See *E.O.*, 311 Ill. App. 3d at 726; accord *In re C.L.T.*, 302 Ill. App. 3d 770, 772 (1999) ("a finding of parental unfitness may be based on evidence sufficient to support any *one* statutory ground, even if the evidence is not sufficient to support other grounds alleged" (emphasis in original)).

■ Subsection (b) provides that a parent's "failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare" is a ground for finding the parent unfit. 750 ILCS 50/1(D)(b) (West 2002). Since this language is in the disjunctive, any of these three elements may be considered on its own as a basis for unfitness: the failure to maintain a reasonable degree of interest *or* concern *or* responsibility as to the child's welfare. See *C.L.T.*, 302 Ill. App. 3d at 773. We recognize, as respondent points out, that in examining allegations under subsection (b), a trial court must focus on a parent's reasonable efforts and not her success, and must consider any circumstances that may have made it difficult for her to visit, communicate with or otherwise show interest in her child. See *E.O.*, 311 Ill. App. 3d at 726-27; see also *In re T.D.*, 268 Ill. App. 3d 239, 246 (1994) (court should examine parent's conduct in context of her circumstances, including her poverty, transportation options, whether visits were discouraged, and effect of personal problems). However, our courts have repeatedly concluded that a parent is not fit merely because she has demonstrated some interest or affection toward her child; rather, her interest, concern and responsibility must be reasonable. See *E.O.*, 311 Ill. App. 3d at 727. Noncompliance with an imposed service plan, a continued addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under subsection (b). See *T.D.*, 268 Ill. App. 3d at 246; *In re M.C.*, 201 Ill. App. 3d 792, 797 (1990). Ultimately, as noted above, we accord great deference to a trial court's finding of

unfitness and will not reverse that finding unless it is against the manifest weight of the evidence. See *In re Grant M.*, 307 Ill. App. 3d 865, 868 (1999).

In the instant case, the trial court commented that respondent "has always showed concern towards that children when she has seen them and also shown interest towards the children when she has seen them." However, the court found that the issue regarding the allegations under section 1(D)(b) was whether respondent maintained a reasonable degree of *responsibility* toward the children's welfare as well. Citing respondent's drug use while the children were in her custody, as well as her "inability or reluctance" to participate in a treatment program and waiting until March 2001 to "actually comply with the dictates of a program," "clearly and convincingly" proved that she failed to show such responsibility.

Given the multitude of facts in this case, we cannot find that the trial court's decision was against the manifest weight of the evidence. With Raven's drug-exposed birth in July 1995, a service plan was imposed and respondent was ordered to participate in a drug treatment program. She did not comply with this plan and Jaron and Raven were removed in May 1996. Respondent did not enter such a program until a year after that, in May 1997. It took her 3½ years to have the children returned to her custody, which did not occur until December 1999. Then, after just three months, respondent began smoking crack cocaine again, doing so three or four times while the children were in her care. She admitted to her relapse in March 2000, and DCFS allowed the children to stay with her and ordered her to again seek treatment. She did not and appeared at a hearing on May 31, 2000, testing positive for cocaine, whereupon the children were removed. Respondent continued to use drugs on a regular basis from June 2000 until October 2000, and became homeless. Yet, she consistently refused to enter an inpatient program as ordered, stating that she "knew how to stay clean." Although she participated in three outpatient detoxification programs, she did not attend every session of these short programs nor did she participate in the aftercare as required. Significantly, she tested positive for drugs each time she "completed" these programs. And, while respondent finally entered an intensive outpatient program in January 2001, she did not take her treatment seriously, as her absenteeism placed her on supervision and caused a month's delay in her completion of the program. Her excuse that her duties as house manager of the shelter caused her absences was directly contradicted by shelter employees, who testified that respondent would have been able to attend the program if she had simply asked. What is more, she again refused to complete aftercare

following this outpatient program and has yet to ever enter an inpatient program as ordered.

During this time, the record also reveals several periods when respondent was not in contact with social workers, missed several scheduled visits with Jaron and Raven, and refused to partake in therapy offered to her by therapist Dorow. There is documentation that respondent did visit the children and brought them toys and food. However, these visits were very few in comparison to the months over which they spanned, and respondent admitted that she was not availing herself of scheduled weekly visits. There is also documentation indicating that respondent acted appropriately with the children while visiting them and that Jaron expressed a desire to live with her. However, there is overwhelming evidence on the record demonstrating that more has been occurring during these visits: Raven regresses to an infant-like state, and Jaron has more often than not expressed confusion, anger, disobedience and worry directly against respondent regarding her drug use and the state of his custody.

Even within the context of respondent's personal circumstances, her lack of interaction with social workers, the children's special needs, her continued refusal to participate in even the most minor aspects of drug treatment and the imposed service plans, and her repeated failure to maintain frequent and regular visitation more than sufficiently demonstrate that she has not maintained a reasonable degree of responsibility toward the welfare of Jaron and Raven. Therefore, we find that the trial court's determination that she was unfit under section 1(D)(b) was not against the manifest weight of the evidence.

## VI. Best Interests

Respondent's final contention on appeal is that the trial court's finding that termination of her parental rights was in the best interests of her children was erroneous because the court failed to consider the "best interest factors" as statutorily required and because the court's finding was against the manifest weight of the evidence.

■ Once a trial court finds a parent unfit under one of the grounds of section 1(D) of the Adoption Act, the next step in an involuntary termination proceeding requires the court to consider whether it is in the best interests of the child to terminate parental rights, pursuant to the Juvenile Court Act (705 ILCS 405/1—3 (West 2002)). See *D.F.*, 332 Ill. App. 3d at 117. The burden of proof is upon the State, which must prove by a preponderance of the evidence that termination is in the child's best interests. See *In re D.T.*, 338 Ill. App. 3d 133, 154 (2003). The court's determination in this respect lies within its sound discretion, especially when it considers the credibility of testimony

presented at the best interests hearing; that determination will not be reversed unless it is against the manifest weight of the evidence or the trial court has abused its discretion. See *In re B.C.*, 317 Ill. App. 3d 607, 614 (2000); *In re G.L.*, 329 Ill. App. 3d 18, 25 (2002).

▪ Section 1—3(4.05) of the Juvenile Court Act requires a trial court to consider a number of factors for termination within "the context of the child's age and developmental needs." 705 ILCS 405/1—3(4.05) (West 2002); see also *G.L.*, 329 Ill. App. 3d at 24. These include:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
> (b) the development of the child's identity;
> (c) the child's background and ties, including familial, cultural, and religious;
> (d) the child's sense of attachments, including:
>> (i) where the child actually feels love, attachment, and a sense of being valued ***;
>> (ii) the child's sense of security;
>> (iii) the child's sense of familiarity;
>> (iv) continuity of affection for the child;
>> (v) the least disruptive placement alternative for the child;
> (e) the child's wishes and long-term goals;
> (f) the child's community ties, including church, school, and friends;
> (g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;
> (h) the uniqueness of every family and child;
> (i) the risks attendant to entering and being in substitute care; and
> (j) the preferences of the persons available to care for the child." 705 ILCS 405/1—3(4.05) (West 2002).

Additionally, a court may consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being. See *In re J.L.*, 308 Ill. App. 3d 859, 865 (1999).

▪ We disagree with respondent's first assertion, *i.e.*, that the trial court erred because it did not "discuss" any of the statutory factors in finding that termination of her rights was in the best interest of Jaron and Raven. Respondent claims that the court used merely one "buzzword" (the term "permanence") in its colloquy, and accordingly, it did not consider any of the other factors. However, respondent presents no legal precedent to establish that a trial court is required to explicitly mention, word-for-word, the factors listed in section

1—3(4.05) while rendering its decision. To the contrary, our law is clear that a trial court need not articulate any specific rationale for its decision, and a reviewing court need not rely on any basis used by a trial court below in affirming its decision. See *McMahon v. Chicago Mercantile Exchange*, 221 Ill. App. 3d 935, 950-51 (1991); *In re Marriage of Lehr*, 317 Ill. App. 3d 853, 862 (2000) (reviewing court need only find sufficient basis in record on appeal). Moreover, our review of the record evidence in relation to the statutory factors, which will be discussed more fully below, indicates to us that the trial court touched upon all of the factors in one form or another throughout the duration of the best interests hearing. The court explicitly stated that it had personally presided over Jaron and Raven's case for some three years.

Even if the trial court's colloquy did not consider every factor, our independent review of the record attests to overwhelming evidence that the statutory factors support the conclusion that Jaron and Raven's best interests lie in the termination of respondent's parental rights. Of Jaron's 9 years of life, he has spent only 27 months in respondent's care. He has been living with his current foster mother Deborah Haynes for over three years, during which time his grades in school have risen greatly, he has learned to play musical instruments, he has become a Boy Scout and he participates in cultural activities. Haynes maintains consistent visitation for Jaron with Raven and his other siblings. Haynes has ensured that Jaron attends his therapy sessions to cope with his custody status and his cerebral palsy, and has expressed a desire to adopt him. Dorow, Jaron's therapist, testified that although respondent visited him and taught him about his heritage and familial identity, Jaron was often either not engaged during her visits or expressed anger and disobedience toward her due to her drug use, and respondent had a hard time tolerating his behavior. Although Jaron has said on occasion he wished to return home to respondent, Jaron also consistently expressed that he wanted to live with Haynes. Dorow noted that when Jaron was scared or wanted affection, he turned to Haynes rather than respondent. Although Buehler had only been assigned to Jaron's case for a month before the best interests hearing, he corroborated much of Dorow's testimony, noting the healthy and respectful relationship Jaron has with Haynes.

Raven was removed from respondent's care a few months after her drug-exposed birth and has lived six of her seven years with the same foster parents, the Wares, who have other adopted and foster children with the same special needs. Delivia Ware testified as to Raven's therapies, the bond she has developed with the family, her marked improvement and the activities she has come to enjoy. Raven also participates in regular visits with Jaron and her other siblings,

and Ware testified that these visits will continue once she and her husband are allowed to adopt Raven. Buehler noted that Raven's foster home was safe and appropriate and was conducive to her special needs.

Respondent presented little evidence during the best interests hearing that the statutory factors lie in her favor. She produced no professional or expert testimony to rebut that of the therapists and caseworkers, all of whom, though noting it may be difficult on the children, strongly recommended termination. She testified only that she has attended some of Jaron's speech therapies, has taught Raven some sign language, and otherwise knows how to care for their special needs.

Based on this record, we find no error with the trial court's determination that the termination of respondent's parental rights was in the best interests of Jaron and Raven.

## CONCLUSION

Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

O'MARA FROSSARD, P.J., and GALLAGHER, J., concur.